George PAPADOPOULOS,
et al., Plaintiffs,

v.

MODESTO POLICE DEPARTMENT,
et al., Defendants

Nos. CV F 96–5889 AWI SMS,
CV F 97–5844 AWI SMS.

United States District Court,
E.D. California.

July 9, 1998.

Richard Bolanos, Whitmore, Johnson & Bolanos, Mountain View, CA, for Defendants Modesto Police Dept., City of Modesto.

Richard K. Critchlow, Critchlow & Diskint, Greenbrae, CA, for Plaintiffs George Papadopoulos, Kevan Avery, Richard Balentine, Joe P. Silva.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION; DISMISSING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS FOR LACK OF JURISDICTION**

ISHII, District Judge.

In these actions four former police officers with the Modesto Police Department ("the Department") claim that they were forced to retire in violation of federal and state statutes prohibiting discrimination based on disability. Three of the four plaintiffs also claim that defendants engaged in the intentional infliction of emotional distress. Defendants City of Modesto ("the City") and the Department now move for summary judgment.

The court has jurisdiction over plaintiffs' disability discrimination claim arising under the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12101 et seq. 28 U.S.C. § 1331.

### PROCEDURAL HISTORY

*I. CV F 96 5889 AWI SMS*

On June 6, 1996 plaintiffs George Papadopoulos, Kevan Avery, and Richard Balentine filed in the Sacramento division their action against defendants the City and the Department. Each plaintiff contended that he was injured in the line of duty, and that he was

forced into retirement by defendants instead of being provided with reasonable accommodations. They assert disability discrimination claims arising under the federal ADA and California's Fair Employment and Housing Act ("the FEHA"). Additionally Papadopoulos and Avery alleged that defendants engaged in the discriminatory conduct either intentionally for the purpose of, or in reckless disregard of the likelihood of, causing them severe emotional distress.

On June 27, 1996 defendants moved to transfer intradistrict venue to Fresno.

On July 3, 1996 plaintiffs filed their First Amended Complaint which essentially contains the same legal claims and names the same parties as does the original Complaint.

On July 26, 1996 this action was transferred to the Fresno division.

On August 16, 1996 defendants answered the First Amended Complaint.

## II. CV F 97 5844 AWI SMS

On July 9, 1997 Joe Silva filed an action in the Sacramento division against the City and the Department, alleging the same set of facts and asserting the same legal claims, including intentional infliction of emotional distress, as in the other action. On August 5, 1997 defendants filed their answer. On September 3, 1997 this action was transferred to the Fresno division.

## III. Consolidated Case

On January 6, 1998 this court approved a stipulation by the parties that the two actions be consolidated for all purposes. The discovery cut-off was re-set for April 22, 1998, and the trial date was set for October 20, 1998. All subsequent documents have been filed in the lower case number.

On May 22, 1998 defendants noticed the pending motion for summary judgment, to which plaintiffs have filed opposition.

## FACTS

### I. Undisputed Facts Offered By Defendants

The Department is divided into four functional work divisions: administration, support services, field operations, and investigations. Undisputed Material Fact 1. The Department has authorized staffing of 355 positions, of which 258 are sworn and 97 are non-sworn. UMF 1. The Field Operations division is responsible for responding to requests for calls for service from the local population, patrol services, traffic services, and other special and general law enforcement activities. UMF 2. Patrol officers in the Field Operations division assigned to patrol are required to participate in pursuits by vehicle, motorcycle and/or foot, and to physically restrain individuals who are observed engaging in or reported to have engaged in illegal conduct. UMF 3.

The City's "modified duty policy" provides for the temporary assignment of modified duties to City personnel who have medical limitations and restrictions identified by treating or examining physicians. UMF 4. The policy limits modified duty assignments to a twenty-five day period, at which time the modified assignment is re-evaluated. UMF 4. This policy specifies that modified duty assignments are only temporary in nature, and will be discontinued when the employee's treating or examining physicians states that the employee can return to regular full duty. UMF 5.

Prior to 1994 the Department's practice with respect to modified duty was to permit long-term modified assignments for police officers who had medical limitations and restrictions. UMF 6. The Department did not strictly adhere to the City's twenty-five day policy, and in many cases modified duty assignments were allowed to continue indefinitely. UMF 6. The Department's practice under the pre–1994 policy was to have "permanent" or "indefinite" modified duty assignments. UMF 6.

In 1994 the Department's modified duty practice was addressed in a Department wide management audit conducted by Ralph Andersen and Associates. UMF 7. The auditors found that as many as fourteen sworn police officers were deployed in long-term modified duty assignments. UMF 7. The auditors determined that when patrol personnel were injured, and thereafter placed on long-term modified duty, their patrol positions were not "backfilled." UMF 8. The auditors concluded that this practice created a burden

on available personnel resources, limited the Department's flexibility in how it utilized sworn officers, and could cause morale problems in the Department. UMF 8. Based on its conclusion that the long-term modified duty assignments tended to weaken the Department's personnel resources, the auditors recommended using a modified duty policy that restricted such assignments to short durations with periodic medical updates. UMF 9. The auditors further recommended that employees who could not return to full and unrestricted duty be considered for voluntarily re-classification to non-sworn positions or medical retirement. UMF 9. Based primarily on the recommendations contained in the management audit the Department determined that it would discontinue long-term modified duty assignments for sworn officers. UMF 10.

Since 1994 the Department's modified duty policy has been to provide such duty to police officers with temporary medical limitations and restrictions. UMF 11. If an officer's limitations and restrictions are deemed by medical experts to be permanent and stationary, the Department assesses whether the limitations preclude the officer from performing the full range of police duties which, as to sworn officers at the rank of corporal or below, necessarily include the ability to physically restrain and detain resistant suspects and to make forcible arrests. UMF 11. If the medical limitations permanently preclude the performance of such duties the Department recommends the employee for disability retirement. UMF 11. In reviewing any officer's case the only concern is whether the officer can perform the full range of police duties as required by the Department. UMF 11. No consideration is given to whether the officer could serve as an officer in a police department with different standards, or whether the officer could perform a job other than as a police patrol officer. UMF 11. Since its implementation the 1994 policy has been consistently applied to all sworn Department officers at the corporal rank or lower, with the exception of one officer who requested and received a demotion to a non-sworn position before the Department issued a recommen-

dation with respect to the implications of his medical condition. UMF 11.

The Department's policy and practice when recommending disability retirement for sworn officers is to submit the recommendation to the City's Personnel Department for review and approval by the Personnel Director and the City Manager. UMF 12. While the recommendation is reviewed the officer's current assignment remains status quo to the extent it is not precluded by medical restrictions and limitations. UMF 12. Frequently the officer awaiting the decision is allowed to work a modified duty assignment. UMF 12. The officer is not separated from duty unless and until the recommendation is approved. UMF 12.

When the Personnel Director receives a disability retirement recommendation, the Director reviews the medical reports and makes an independent finding regarding whether the physical impairments and work restrictions are such that the officer is precluded from meeting the Department's requirement that all officers be capable of effectuating forcible arrests. UMF 13. If the Personnel Director concurs with the Department's recommendation, the Director forwards the recommendation to the City Manager for certification. UMF 13. The recommendation to initiate disability retirement is made based on the understanding that, as a contracting member of the California Public Employees' Retirement System ("PERS"), the City is required by state law to process applications for employees who are permanently physically incapable of performing the required duties of the position to which they are assigned. UMF 13.

The procedures described in the above two paragraphs were followed as to the four plaintiffs. UMF 14. Each plaintiff was also offered the opportunity to receive vocational rehabilitation benefits in accordance with state law. UMF 15. Such benefits involve using City funds to train qualified employees for work in an alternative profession. UMF 15. No plaintiff was required to participate in vocational rehabilitation. UMF 15.

Since 1994 the City has had in place a written policy providing for disability retire-

ment appeal procedures as required by state law. UMF 16. The procedure provides for an evidentiary hearing before an administrative law judge. UMF 16; Defendants' Exhibit 3.

At all times relevant to this action the Modesto Police Officers' Association ("the MPOA") served as the exclusive labor representative for the City's rank-and-file police officers, including Papadopoulos, Balentine and Silva. UMF 17. At all relevant times the City and the MPOA had in place a collective bargaining agreement addressing wages, hours, terms and conditions of employment for member of the MPOA bargaining unit. UMF 18. MPOA representative Paul Konsdorf discussed aspects of the disability retirement process with all four plaintiffs. UMF 68. Konsdorf was unaware of a basis to challenge the disability retirements. UMF 69. Konsdorf's conclusion was based in part on a consultation with the union's legal counsel, which led Konsdorf to believe that there was no such mechanism. UMF 69. Konsdorf did not consult with any City official to confirm the accuracy of that belief. UMF 69.

Papadopoulos, Avery, Balentine and Silva do not claim to have a physical impairment that substantially impairs a major life activity. UMF 20. Instead each asserts that defendants regarded them as having a physical impairment that substantially impairs a major life activity. UMF 20.

### A. Balentine

At the time of his retirement Balentine was employed as a police officer assigned to the Field Operations Division. UMF 21. Due to medical limitations and restrictions Balentine was working modified duty as a station officer when he was notified of his proposed disability retirement. UMF 21.

By report dated July 27, 1994 the City was advised by Dr. Robert England that Balentine's work-related injuries to his left hand and right ankle were "permanent and stationary,"[1] and permanently precluded him from repetitive forceful gripping, heavy lifting, squatting, running, jumping and kneeling. UMF 22. Based on Dr. England's report Police Captain David Leonardo determined that Balentine was permanently precluded from performing the full range of police officer duties. UMF 23.[2] Based on that determination, and in accordance with the Department's policy of no longer making permanent modified duty assignments, the Department recommended Balentine for disability retirement. UMF 23. In reaching this decision, the only factor considered by Leonardo was whether Balentine could continue to function in light of the Department's policy that all sworn officers and corporals be capable of performing the full range of police duties; he did not consider whether Balentine could serve as an officer in a department with different requirements or whether Balentine was precluded from working in any other job within or outside the field of law enforcement. UMF 23.

By letter dated November 29, 1994 an examiner with the City's Personnel Department confirmed Dr. England's findings, advised Balentine that permanent modified duty was not available through the City "at this time," and explained his entitlement to voluntary vocational rehabilitation benefits. UMF 24; Defendants' Exhibit 6. On or about December 14, 1994 Balentine meet with Captain Leonardo and Captain Guthrie to discuss

---

1. "Permanent and stationary" is a term of art used with respect to workers' compensation claims. Cal.Lab.Code § 4061; Western Growers Ins. Co. v. Workers' Compensation Appeals Board, 16 Cal.App.4th 227, 235, 20 Cal.Rptr.2d 26 (1993) ("disability ... is permanent when the employee's condition has reached maximum improvement or the condition has become stationary for a reasonable period of time").

2. Plaintiffs object to UMF 23 on the ground that Captain Leonardo's testimony is "incompetent as to what factors were or were not considered by assorted individuals in the process." The court overrules this objection. In his declaration Captain Leonardo states that he oversees, among other things, the administrative and personnel functions of the Department, and that he was directly involved in determining the bases for and recommending the disability retirements for all four plaintiffs. Since Leonardo declares that he "was directly involved" in the disability retirement recommendation, and also declares that he personally reviewed Dr. England's report concerning Balentine's physical limitations, the court finds that Leonardo is competent to testify as to what factors he considered in forming his opinion that Balentine was not able to perform the job of sworn police officer with the Department.

the disability recommendation. UMF 25. At this meeting Balentine and Leonardo discussed Balentine's options and Balentine understood his right to appeal the disability determination. UMF 25. Balentine's disability retirement was approved by PERS effective December 28, 1994. UMF 26.

After his disability retirement Balentine was offered and accepted a temporary position with the Department conducting background investigations. UMF 27. He worked at this position for two months and then resigned. UMF 27.

Balentine currently is a temporary employee with the Stanislaus County Sheriff's Department, performing a variety of functions such as court bailiff, background investigator and court magnometer operator. UMF 29.

### B. Avery

At the time of his retirement Avery was employed as a police corporal assigned to the Field Operations Division. UMF 30. When he suffered an on-duty back injury on October 10, 1994 he was serving as a station supervisor. UMF 31. He subsequently was permitted to remain in that assignment until his retirement because the assignment fit his physical limitations. UMF 31. He performed that modified duty assignment until his retirement on April 18, 1995. UMF 31.

Because of his back injury Avery could not participate in his usual customary job. UMF 39. In particular he had difficulty sitting in a car or standing for a long period of time, and certainly did not want to be in a physical confrontation with somebody. UMF 39; Defendants' Exhibit 33.

By written report dated March 31, 1995 Dr. Edward Chook advised the City that Avery's back injury was permanent and stationary, and that Avery was medically restricted from heavy lifting, prolonged standing or sitting, and from strenuous activity. UMF 32. Based on Dr. Chook's report Leonardo determined that Avery was permanently precluded from performing the full range of police officer duties. UMF 33.[3] Based on that determination, and in accordance with the Department's policy of no longer making permanent modified duty assignments, the Department recommended

Avery for disability retirement. UMF 33. In reaching this decision, the only factor considered by Leonardo was whether Avery could continue to function in light of the Department's policy that all sworn officers and corporals be capable of performing the full range of police duties; he did not consider whether Avery could serve as an officer in a department with different requirements or whether Avery was precluded from working in any other job within or outside the field of law enforcement. UMF 33.

On or about April 3, 1995 Avery was notified by Lt. Lyon that the Department was separating him from service due to his physical limitations. UMF 34. The same day Avery meet with Leonardo to discuss the proposed retirement. UMF 34. During his meeting with Leonardo Avery was advised of Dr. Chook's findings and restrictions. UMF 35. Avery was further advised that because there were no permanent modified duty assignments the Department was proposing that Avery receive a disability retirement. UMF 35. Avery did not agree with Leonardo's assertion that there were no permanent modified duty assignments, but Avery did not voice his disagreement because he believed that such disagreement would be fruitless. UMF 36.

After meeting with Leonardo, but before his retirement became effective, Avery met with his union representative, Paul Konsdorf, to discuss the Department's decision to pursue his retirement, but Avery did not ask Konsdorf to appeal the decision. UMF 37.

By letter dated May 25, 1995 PERS notified Avery of the City's determination that he was incapacitated from performing the duties of police corporal, that he would receive a disability retirement, and that any appeal of the decision was to be made to the City. UMF 38.

### C. Papadopoulos

At the time of his retirement Papadopoulos was employed as a police officer assigned to the Field Operations Division. UMF 41.

By written report dated September 2, 1992 Dr. Porecha informed the City that "since

**3.** Plaintiffs raise the same objection as set forth in footnote 2, which is also overruled.

"5/92" Papadopoulos' back injury was permanent and stationary, and that he was precluded from heavy lifting and from repeated bending and stooping. UMF 42; Defendants' Exhibit 14. Based on Dr. Porecha's report Leonardo determined that Papadopoulos was permanently precluded from performing the full range of police officer duties. UMF 43.[4] In reaching this decision, the only factor considered by Leonardo was whether Papadopoulos could continue to function in light of the Department's policy that all sworn officers and corporals be capable of performing the full range of police duties; he did not consider whether Papadopoulos could serve as an officer in a department with different requirements or whether Papadopoulos was precluded from working in any other job within or outside the field of law enforcement. UMF 43.

Between September 1992 and the effective date of his retirement Papadopoulos was offered and performed the modified duty assignment of Public Assistance Officer. UMF 44. In June 1995 the Department determined that staff shortages required that the Department fill Papadopoulos' allocated position with an officer physically capable of performing the full range of police officer duties. UMF 45. This fact, combined with the Department's policy not to grant permanent modified duty assignments, prompted the Department to recommend Papadopoulos for a disability retirement. UMF 45. On or about June 20, 1995 Leonardo met with Papadopoulos to inform him of the Department's decision. UMF 45.

After meeting with Leonardo, but before his retirement was effective, Papadopoulos met with the City's Risk Manager Norris and the City's Personnel Manager Renwick. UMF 46. Papadopoulos discussed with Renwick the possibility of an appeal to address the Department's retirement decision, but this discussion was limited to Renwick's statement that she didn't know what the appeal procedure was. UMF 46.

After receiving notice of the Department's retirement decision, but before his retirement became effective, Papadopoulos met with his union representative, Paul Konsdorf, to discuss his dissatisfaction with the Depart-

ment's retirement decision. UMF 47. Konsdorf led Papadopoulos to believe that there was no avenue to take regarding his separation from the City. UMF 47. Konsdorf told Papadopoulos that he (Konsdorf) believed that filing a grievance would be useless since the City Manager has the final word in the grievance process. UMF 47.

By letter dated July 20, 1995 PERS issued notice to Papadopoulos of the City's determination that he was incapacitated from performing the usual and customary duties of his position, and that any appeal of the determination must be made to the City. UMF 48. Papadopoulos' retirement became effective August 8, 1995. UMF 49.

Papadopoulos is currently employed as a reserve Deputy Sheriff with Stanislaus County. UMF 51.

### D. Silva

At the time of his retirement Silva was employed as a police officer assigned to the Support Services Division working as a School Resources Officer, also known as a DARE officer. UMF 52. As a DARE officer Silva provided classroom instruction on drug and gang prevention programs. UMF 53. Silva's DARE assignment was a five year special assignment outside of patrol. UMF 54. Silva's DARE assignment was originally due to be completed in February 1996. UMF 55. Under the Department's special assignments policy, Silva was required to rotate back into patrol duties in the Field Operations Division after his DARE assignment was completed. UMF 54.

By written report dated October 28, 1994 the City was informed by Dr. Fassero that Silva's knee injury precluded him from working as a police officer on patrol, but that Silva would be a candidate for "an administrative type position." UMF 56; Exhibit 15. By written notice dated November 10, 1994 the City informed Silva of Dr. Fassero's finding that Silva was precluded from the full range of police officer duties, and that Silva was now eligible to receive vocational rehabilitation benefits. UMF 57.

4. Plaintiffs raise the same objection as set forth in footnote 2, which is also overruled.

By written report dated July 25, 1995 the City was informed by Dr. Chittenden that Silva's knee injury was permanent and stationary, and that Silva was permanently precluded from heavy lifting and from repeated bending and stooping. UMF 58.

Based on Dr. Fassero's and Dr. Chittenden's reports Leonardo determined that Silva was permanently precluded from performing the full range of police officer duties. UMF 59.[5] Based on that determination, and in accordance with the Department's policy of no longer making permanent modified duty assignments, the Department recommended Silva for disability retirement. UMF 59. In reaching this decision, the only factor considered by Leonardo was whether Silva could continue to function in light of the Department's policy that all sworn officers and corporals be capable of performing the full range of police duties; he did not consider whether Silva could serve as an officer in a department with different requirements or whether Silva was precluded from working in any other job within or outside the field of law enforcement. UMF 59.

On or about December 13, 1995 Silva represented to the Benefits Division of the California Workers' Compensation system that his knee injury affected his job as a police officer because it precluded him from using any physical force to apprehend suspects. UMF 61.

Because Silva's duties as a DARE officer were not precluded by the medical limitations and restrictions identified by Drs. Fassero and Chittenden, the Department determined that Silva should complete his DARE assignment, at which time he would receive a disability retirement. UMF 60. Silva's DARE assignment was extended to June 25, 1996 to allow him to finish the academic year. UMF 60.

By written notice dated May 2, 1996 the City notified Silva that an application for a disability retirement had been made on his behalf to PERS. UMF 62. That notice further advised Silva that his retirement would be effective June 25, 1996, and that he had the right to appeal the retirement decision. UMF 62. Silva chose not to appeal his disability retirement under the City's disability retirement procedure. UMF 63. Silva's retirement became effective as planned on June 25, 1996. UMF 64. Silva is currently employed full-time as a school teacher with the Modesto City School District. UMF 66.

## II. Additional Undisputed Facts Offered By Plaintiffs

Each plaintiff served as longtime, dedicated, and exemplary police officers in the Department. UMF 1. Papadopoulos served for nearly 22 years, Avery for more than 25 years, Balentine for more than 15 years, and Silva for nearly 20 years. UMF 1.

Each plaintiff is physically able to perform many particular duties within the Department. UMF 2.[6]

## III. Other Evidence Offered By Plaintiffs To Which Objections Are Well–Taken

Plaintiffs' proffered UMF 3 states that the Department's policy requiring all sworn officers at the corporal rank or lower to be capable of rotating as patrol officers puts officers in the position of being reluctant to report disabling injuries, and that this reluctance leads to dangers to officers and the public, and causes sinking officer morale. This proposed undisputed fact further states that an unnamed lieutenant in the Department used to go out on patrol calls, but would not exit his vehicle to assist officers engaged in physical confrontations with suspects, and that when it became apparent that the lieutenant would not assist the field officers, the morale of his platoon fell dramatically. According to the proposed UMF 3,

5. Plaintiffs raise the same objection as set forth in footnote 2, which is also overruled.

6. Defendants object on the ground that the individual officers lack a foundation to testify as to whether different "positions" actually existed, and whether there were any vacancies at the time of their retirements if the positions actually existed. To the extent that plaintiffs name particular "positions" that are asserted to have been available, the objection is sustained. However to the extent that plaintiffs declare that there existed within the Department particular job duties that they could have performed, they do not lack foundation to offer such evidence given that it is undisputed that each plaintiff had been, prior to the medical retirements, performing such job duties.

the morale of that platoon did not improve until the lieutenant agreed with his superiors not to go into the field.

This proposed UMF is based on the Declaration of plaintiff Avery. Avery provides no foundation for his knowledge of these statements. He does not, for instance, testify that he was a member of the unidentified platoon that worked with or under the unnamed lieutenant. Without a foundation that the statements are based on his own personal knowledge, the only reasonable conclusion is that they are based on out-of-court statements. Therefore defendants' objections based on lack of foundation and hearsay is sustained.

## LEGAL STANDARD

Summary judgment of an action, or summary adjudication of claims within an action, shall be granted upon a showing that there exists no genuine issue as to a particular claim or defense, and that the undisputed facts establish that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c), (d).

The moving parties have the initial duty to inform the court of the basis or bases for their motion, and to identify the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that demonstrate the absence of a genuine issue as to any material fact. Rule 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving parties must also demonstrate that the undisputed facts entitle the movant to judgment as a matter of law. Rule 56(c).

If the moving parties meet this initial burden, in order to withstand a motion for summary judgment or adjudication, the opposing parties "must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). A material issue of fact is one that affects that outcome of the case and requires a trial to resolve differing versions of the truth. *United States v. First Nat'l Bank*, 652 F.2d 882, 887 (9th Cir.1981). Those facts must amount to "sufficient evidence favoring the [opposing] party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must make its determination after considering the evidence submitted, and all reasonable inferences drawn from that evidence, in the light most favorable to the non movants. *Id.* at 255–56, 106 S.Ct. 2505.

## DISCUSSION

Defendants move for summary judgment of these actions. As to the First through Fourth Causes of Action, all of which allege violations of federal or state disability antidiscrimination statutes, defendants assert that (1) plaintiffs cannot prove that they are "disabled" in that defendants did not regard them as being substantially limited in the major life activity of working, and (2) plaintiffs' medical retirements were not an adverse employment action within the meaning of the ADA and the FEHA. As to the First and Third Causes of Action alleging a "disparate treatment" theory of discrimination, defendants submit that plaintiffs lack evidence of discriminatory intent based on the perceived disabilities. Further, regarding the Second and Fourth Causes of Action claiming a "disparate impact" theory of discrimination, defendants contend that plaintiffs lack evidence that defendants have a policy which has a disproportionate impact on disabled persons, or that if such a policy does exist it is otherwise allowable under the ADA.

As will be discussed below, defendants have shown that plaintiffs lack evidence to prove the "threshold" issue that plaintiffs are disabled within the meaning of the ADA and the FEHA. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir.1998) ("[d]isability is the threshold requirement to claim discrimination under the ADA"); *Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1049 (5th Cir.1998) ("threshold issue in a plaintiffs prima facie case is a showing that he suffers from a disability protected by the ADA"); *Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 862 (1st Cir.1998) ("whether an individual is "disabled" is a threshold issue; if one is not disabled, then one is not protected by the ADA against discrimination"). Given that plaintiffs lack evidence to establish that they are subject to the protections of the ADA, summary adjudication of the four disability discrimination causes of action

in favor of defendants is warranted. It is unnecessary to consider the various alternative grounds for summary adjudication of the discrimination claims as posed by defendants.

## I. *Plaintiffs' ADA and FEHA Claims May Be Analyzed Together*

The First and Third Causes of Action allege that defendants violated the ADA and the FEHA by intentionally discriminating against plaintiffs' when defendants forced them "to take medical retirement because defendants perceived" them as disabled. The Second and Fourth Causes of Action allege that defendants violated the ADA and the FEHA because defendants have a policy that causes persons perceived by defendants as being disabled to be terminated from their jobs, while those who are not so perceived by defendants are not terminated.

Because the same legal standards apply to both FEHA and ADA claims, and because plaintiffs present their ADA and FEHA claims as alternative legal theories premised upon the exact same factual allegations, the ADA and FEHA claims will be analyzed together. *Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 271 (9th Cir.1996).

Further because the "ADA defines disability substantially the same as the Rehabilitation Act of 1973 defines handicap ... cases interpreting either will be instructive for this analysis." *Wooten v. Farmland Foods,* 58 F.3d 382, 385 n. 2 (8th Cir.1995).

## II. *Plaintiffs Lack Evidence That Defendants Regarded Them As Being Substantially Limited In The Major Life Activity Of Working*

■ "In order to lay claim to the protections of the ADA, [the plaintiff] must first demonstrate that [he] is disabled within the meaning of the Act." *Thompson v. Holy Family Hospital,* 121 F.3d 537, 539 (9th Cir. 1997). In this action each plaintiff claims that he is disabled under the definition set forth in 42 U.S.C. § 12102(2)(C): "being regarded as having" a physical impairment that substantially limits a major life activity. Congress intended that the "regarded as" definition of disability would protect people from discriminatory actions, based on employer's myths, fears and stereotypes about disability, which may occur even where a person does not actually have an actual disability. *Muller v. Automobile Club.,* 897 F.Supp. 1289, 1297 (S.D.Cal.1995).

The complaints do not allege the nature of the major life activity which defendants allegedly perceived plaintiffs to be substantially limited in. In their opening brief, defendants assume that the major life activity is working. In their opposition brief, and at oral argument of this matter, plaintiffs confirmed that working is the major life activity in question.

Congress has instructed the Equal Employment Opportunity Commission to issue regulations necessary to implement the ADA. 42 U.S.C. § 12116. In order to establish a "substantial limitation" in the major life activity of working, E.E.O.C. regulations explain that a plaintiff must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The regulations further explain that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* "As with real impairments ... a perceived impairment must be substantially limiting and significant." *Thompson,* 121 F.3d at 541 (quoting *Gordon v. EL. Hamm & Assocs.,* 100 F.3d 907, 913 (11th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997)).

Two published Ninth Circuit cases have addressed, in part, the evidence necessary to establish the "perceived as" definition of disability where the major life activity in question is working.

In *Holihan v. Lucky Stores, Inc.,* 87 F.3d 362, 366–67 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1349, 137 L.Ed.2d 506 (1997), the Ninth Circuit concluded that the plaintiff, a supermarket manager, raised a triable issue of fact as to whether the employer perceived him as being substantially limited in the major life activity of working. In that case the employer called the plaintiff into the office twice to discuss "aberrational behavior," including exhibitions of abusive behavior toward coworkers, and also had re-

ceived reports diagnosing the plaintiff with depression, anxiety and stress. The Ninth Circuit held that this was sufficient evidence to establish that the employer perceived the plaintiff to have a disabling psychiatric condition that would disqualify the employee from a broad range of jobs. *Id.; Thompson,* 121 F.3d at 541 n. 3 (discussing the meaning of the *Holihan* holding).[7]

In *Thompson,* the plaintiff nurse suffered a work-related back injury, and after the hospital employer was informed that Thompson's lifting restrictions had become "permanent" it placed her on leave of absence because she could not provide "total patient care." The employer subsequently notified her of another job at the hospital, but the plaintiff did not receive that job and later took a sales position with another employer in the health care field. The Ninth Circuit concluded that the plaintiff lacked sufficient evidence to her employer "regarded her" as substantially limited in her ability to work:

> Thompson also points to affidavits by her supervisors noting her inability to perform the duties required in a position of total patient care. However, an employer's decision to terminate an employee "based upon the physical restrictions imposed by [her] doctor ... does not indicate that [the employer] regarded [her] as having a substantially limiting impairment." *Wooten,* 58 F.3d at 386. The evidence does not establish that the hospital viewed Thompson as precluded from performing a broad class of jobs. Indeed, Thompson was made aware of another job opportunity at the hospital, and Holy Family submitted a counselor's affidavit enumerating several possible jobs in the nursing industry. *See Gordon,* 100 F.3d at 913 (determining that, in the context of perceived disabilities, a significant impairment is one that the employer views as foreclosing the type of employment involved); *Ray,* 85 F.3d at 229–30 (although an employee was terminated because his medical condition prevented him from performing his job as a lift truck operator, there was no evidence that his employer regarded him as incapa-

ble of performing another job); *Welsh v. City of Tulsa, Okl.,* 977 F.2d 1415, 1419 (10th Cir.1992) ("[A]n impairment that an employer perceives as limiting an individual's ability to perform only one job is not a handicap under the [Rehabilitation] Act.").

*Id.* at 541.

Defendants contend that none of the plaintiffs can prove that defendants perceived them to be substantially limited in a broad class of jobs, only that defendants perceived them as being unable to perform the particular job of a sworn police officer at the rank of corporal or below with the Department.

In this type of action the appropriate "broad class of jobs" or "entire class of jobs" is the law enforcement field in general. *See Hughes v. Bedsole,* 48 F.3d 1376, 1388–89 (4th Cir.) (shift supervisor at jail alleged that she was terminated due to "tennis elbow;" court held that plaintiff could not prove her employer regarded her as being unable to work in "law enforcement generally"), *cert. denied,* 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995); *Venclauskas v. Connecticut Dep't of Public Safety,* 921 F.Supp. 78, 82 (D.Conn.1995) (applicant for state trooper position rejected due to vision problem; class of jobs analyzed as "field of law enforcement," not "the narrow field of Connecticut state police law enforcement"); *Smaw v. Commonwealth of Va. Dep't of State Police,* 862 F.Supp. 1469, 1475 (E.D.Va.1994) (state trooper reclassified to dispatcher position; court held that proper class was "field of law enforcement as a whole," specifically rejecting plaintiff's suggestion that the profession should be the more narrow "active law enforcement jobs").

■ Further, being discharged from, or not being hired for, a position within a particular law enforcement agency constitutes insufficient evidence to prove that the plaintiff is substantially limited in the major life activity of working. *Daley v. Koch,* 892 F.2d 212, 215–16 (2d Cir.1989) (defendant rejected applicant for New York City police officer job due to failure to pass personality trait test;

---

7. While *Holihan* does not explain what the broad class of jobs in question was, it is reasonable to infer that if an employer perceives a worker as being unable to satisfactorily perform a job with

co-workers due to a disabling psychiatric condition, the employer might reasonably regard that worker as being unable to perform a wide range of jobs, not just jobs at supermarkets.

court held that "being declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity");[8] *Fussell v. Georgia Ports Authority*, 906 F.Supp. 1561, 1573 (S.D.Ga.1995) (police officer discharged from duty after being unable to pass firearm proficiency test could not show that he was disabled in the major life activity of working), *aff'd*, 106 F.3d 417 (11th Cir.1997); *Joyce v. Suffolk County*, 911 F.Supp. 92, 96–97 (E.D.N.Y.1996) (police officer candidate not hired because of inability to pass vision test; court held that the vision "impairment" did not substantially limit plaintiffs chances for employment generally even though it disqualified him for employment as a police officer with the Suffolk County Police Department).

■ Based on the above caselaw the court concludes that the relevant inquiry is whether defendants regarded plaintiffs, due to their physical injuries, as being unable to work in the field of law enforcement generally, not whether defendants regarded plaintiffs as being unable to perform the position of sworn police officer with the Department.

■ Defendants meet their initial burden under Rule 56 to establish that they did not regard plaintiffs, based on plaintiffs' physical impairments, as being unable to work in the field of law enforcement generally, but rather that they regarded each plaintiff as being unable to work as sworn Department police officers or corporals. Captain David Leonardo declares that he oversees the Department's administrative, personnel, training and records functions, and that he was directly involved in determining the bases for and recommending disability retirements for the four plaintiffs. Leonardo Declaration at ¶ 2. Leonardo was informed by physicians that each plaintiff was permanently unable to perform certain tasks,[9] and based on the

medical reports, Leonardo regarded plaintiffs as being unable to perform the full range of police officer duties required of a sworn Modesto Police Department officer at the rank of corporal or lower, namely being able to physically restrain resistant suspects and otherwise have the ability to effectuate forcible arrests. Leonardo Declaration at ¶¶ 10, 11 (Balentine), 13, 14 (Avery), 16, 17, 19 (Papadopoulos), 21, 22, 24 (Silva). The Leonardo Declaration further explains that due to this belief, each plaintiff was recommended for disability retirement, and that in making this recommendation the only factor considered was whether each plaintiff could continue to work as a sworn officer or corporal, which included being able to effectuate forcible arrests. *Id.* at ¶¶ 11 (Balentine), 14 (Avery), 17 (Papadopoulos), 24 (Silva). No consideration was given to whether the plaintiff could work as a police officer for another agency that did not require its sworn officers at the corporal rank or lower be able to effectuate forcible arrests, or whether the plaintiff could work in any other job within the field of law enforcement. *Id.*

Defendants also submit evidence that the City, through its Personnel Director Robin Renwick, concurred with Leonardo's recommendations that each plaintiff was permanently incapable of effectuating forcible arrests after conducting an independent review. Declaration of Robin Renwick at ¶¶ 2, 3. Renwick thereafter recommended that each plaintiff be placed on medical disability available under state law after concluding that each plaintiff's physical impairments made him incapable of performing the full range of Department-required police duties. *Id.* at ¶ 3. Renwick did not consider whether the plaintiffs could perform any job other than that of a police patrol officer. *Id.*

---

**8.** The Ninth Circuit cited favorably to *Daley* in *Thompson* in support of its conclusion that the nurse plaintiff in *Thompson* was unable to withstand a motion for summary judgment because she lacked "evidence that the restrictions on her ability to perform total patient care preclude her from engaging in an entire class of jobs." 121 F.2d at 540–41. *Thompson* interpreted *Daley* as holding "that unsuitability to be a police officer is not a substantial limitation on working." *Id.* at 541.

**9.** Dr. England found that Balentine was permanently precluded from forceful gripping, heavy lifting, squatting, running, jumping and kneeling. Dr. Shook found that Avery was permanently restricted from heavy lifting, prolonged standing or sitting, and from engaging in strenuous activity. Dr. Porecha found that Papadopoulos was precluded from heavy lifting and from repeated bending and stooping. Dr. Chittenden found that Silva was permanently precluded from heavy lifting and from repeating bending and stooping.

The above is sufficient evidence to establish that defendants did not regard the plaintiffs as being unable to work in the law enforcement field generally, but rather that defendants regarded plaintiffs as being unable to work as a Department sworn police officer, or in the case of Avery, a Department police corporal.

In response plaintiffs claim that defendants regarded them as being unable to perform "the entire class of police officer positions at the Department." As a factual matter this statement is a fair statement given that the Department now has a policy requiring all sworn officers holding the rank of police officer or corporal to be capable of performing patrol functions, which includes being able to engage in foot pursuits and to effectuate forcible arrests. For instance the Department does not hire persons as police officers, and then permanently assign them to what was previously referred to as a "modified duty" position. Thus by making patrol duties a necessary requirement of every sworn officer's job, defendants necessarily regarded plaintiffs as being unable to perform a job as a sworn officer or corporal with the Department, no matter what particular job duties might be assigned to the officer at any given time.

As a legal matter, however, this fact is insufficient to defeat summary judgment. Plaintiffs state that defendants cannot be allowed to insulate themselves from liability under the ADA and the FEHA "by announcing that an entire range or class of jobs is now a single, particular job." This contention only makes legal sense if police officers positions with the Modesto Police Department are themselves "an entire range or class of jobs," a proposition without legal support. To be substantially limited in the major life activity of work under a "being regarded as having" a disability theory, under the caselaw identified above the employer must regard the plaintiff as being precluded from work in the field of law enforcement generally, not precluded from a particular job, police positions with a particular department, or even from "active" law enforcement work. Plaintiffs demonstrate that defendants regarded them as being unable to perform work as sworn officers or corporals with the Modesto Police Department. Whether the "job" of sworn police officer, or corporal, with the Modesto Police Department is one job or a number of different jobs now being characterizing as one job, to the extent such a question is in dispute, the dispute is not material to the question of whether defendants regarded plaintiffs as being unable to work in the law enforcement field generally.

As defendants point out in their reply brief the Ninth Circuit in *Thompson* cited with approval the *Daley* holding that being regarded as unable to work as a police officer with the City of New York Police Department did not suffice to show that defendants regarded the plaintiff as being substantially limited in the major life activity of working. If the job of police officer with the NYPD Police Department is not considered a "broad range of jobs," [10] such that not being so hired does not, as a matter of law, substantially limit one in the major life activity of working, neither would being terminated from the job of sworn police officer or corporal with the Modesto Police Department be sufficient to demonstrate that plaintiffs were perceived to be substantially limited in the major life activity of working.

Further plaintiffs' argument ignores the Ninth Circuit's interpretation of the *Daley* holding, as set forth in *Thompson*, which is that *Daley* stands for the proposition that "unsuitability to be a police officer is not a substantial limitation on working." The Ninth Circuit's favorable citation to *Daley*, after explicitly stating how it believed *Daley* should be interpreted (as set forth in the preceding sentence), is a strong signal that, even if defendants regarded plaintiffs as being unable to perform the job of police officer with any police department anywhere, that would still be insufficient to establish that they perceived plaintiffs as being unable to work in the law enforcement field *generally*.

**10.** The Fifth Circuit has taken judicial notice of the fact that the NYPD employs over 27,000 police officers. *Chandler v. City of Dallas*, 2 F.3d 1385, 1392 n. 29 (5th Cir.1993), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) (impairment affecting only a "narrow range of jobs" is not a substantial limitation on major life activity of working; noting that a narrow range of jobs may be numerically significant, citing the *Daley* example of NYPD police officers).

*See also Bridges v. City of Bossier,* 92 F.3d 329, 334 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997) (firefighter applicant rejected due to mild hemophilia; court held that jobs involving routine exposure to extreme trauma, such as firefighting, constitute a narrow range of jobs and those disqualified from holding such jobs are not disabled under the ADA).

Plaintiffs seek to distinguish many of the cases addressing police officers' inability to work for particular departments on the ground that many, such as *Daley,* involve the rejection of candidates for police officer positions, rather than terminating present employees. Setting aside the fact that some of the cited police officer cases do involve terminations, plaintiffs do not provide any logical reason why it makes a difference, for the purpose of the determining the threshold question of whether a person is disabled, whether the adverse employment action in question is alleged to be a job application rejection or a job termination. The distinction may have relevance if the issue is whether a police department failed to provide a reasonable accommodation; however that issue does not arise in this action because plaintiffs lack evidence to make the threshold showing that defendants regarded them as being unable to work in the law enforcement field generally.

Plaintiffs also claim, without citing any evidentiary support, that defendants additionally regarded them as being unable to perform the separate job or jobs of "unsworn" positions with the Department. While the legal relevance of this point is questionable for the same reasons discussed above, it is also not reasonable to infer that because defendants regarded them as being unable to work as sworn officers, a job which requires being able to effectuate forcible arrests, defendants also regarded them as being unable to perform other unspecified work as unsworn officers.[11] In fact defendants did regard each

plaintiff has being able to perform law enforcement work that did not involve patrol duty because defendants, for certain time periods, assigned each plaintiff to non-patrol duties under the "modified duty policy." Additionally the Department offered Balentine a position as a background investigator after his retirement, which Balentine accepted and so worked for a period of time.

Plaintiffs also claim that they could have been assigned to duties which did not necessarily require participation in patrol duties, relying on the fact that they had previously been assigned to such modified duties. This type of contention is best characterized as an argument that defendants failed to reasonably accommodate their perceived disabilities. However as set forth above the issue of whether an employer has reasonably accommodated a disabled person arises only after the threshold question of disabled is answered.

Plaintiffs also rely on 42 U.S.C. § 12112(b)(3) and (b)(6) in opposition to the summary judgment motion. 42 U.S.C. § 12112(b) includes certain statutory prohibitions of specified conduct by employers. Subsection (b)(3) prohibit employers from using "standards, criteria, or methods of administration" that have a discriminatory effect on disabled workers, *Kirkingburg v. Albertson's, Inc.,* 143 F.3d 1228, 1235–36 (9th Cir.1998),[12] while subsection (b)(6) prohibits employers from "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities" unless the standard, test or criteria is job-related and consistent with business necessity.

In response defendants maintain that the "forcible arrest" policy now in place, under which all sworn officers and corporals must be able to effectuate such arrests, does not have an impermissible effect on the disabled.[13] The court will not determine wheth-

---

11. Plaintiffs present no evidence to explain what different distinctions exist between sworn and unsworn Department employees, which further demonstrates how this factually unsupported contention fails to establish the existence of a material issue of disputed fact.

12. In this case the Ninth Circuit noted that an employer does not violate the ADA if the chal-

lenged job-related criterion will "screen out disabled workers" that "would constitute safety hazards." *Id.*

13. *See Champ v. Baltimore County,* 884 F.Supp. 991 (D.Md.1995), *aff'd,* 91 F.3d 129, 1996 WL 383924 (4th Cir.1996) (after police department instituted policy requiring all officers to be able to effectuate forcible arrests, plaintiff was given

er the "forcible arrest" requirement might have an unlawful disproportionate impact on the disabled in the light of the fact that plaintiffs have not shown that defendants regard them as being substantially limited from working in the field of law enforcement generally. Because plaintiffs have not established that they are disabled within the meaning of the ADA and the FEHA, the court finds they lack standing to question whether a particular business policy has a disparate impact on disabled persons.

For the above reasons defendants' motion for summary adjudication as to the First, Second, Third and Fourth Causes of Action, all of which sound in disability discrimination, is granted.

### III. The Remaining Claims Are Dismissed For Lack Of Subject Matter Jurisdiction

The court has dismissed all federal claims in this action, as well as the parallel state claims arising under the FEHA. The only remaining claims are the state tort claims of intentional infliction of emotional distress pleaded by all plaintiffs except Balentine. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). The court finds that this is the usual case in which the court will decline to exercise supplemental jurisdiction over remaining pendent state claims. 28 U.S.C. § 1367(c)(3). The intentional infliction of emotional distress claims are therefore dismissed without prejudice to filing in state court. 28 U.S.C. § 1367(d).

### CONCLUSION

The evidence, construed in the light most favorable to plaintiffs, shows that defendants regarded each plaintiff as being unable to work as a sworn officer or corporal with the Department due to various physical impairments. However to prove that they are disabled within the meaning of the ADA and the

FEHA, considering the theory upon which plaintiffs are proceeding, plaintiffs must prove that defendants regarded them as being unable to work in the law enforcement field generally as a result of their various impairments. Defendants have shown that plaintiffs lack evidence to prove that defendants regarded plaintiffs in that manner, and therefore defendants are entitled to summary adjudication in their favor as to the four causes of action arising under the ADA and the FEHA.

While plaintiffs, who were injured while on-the-job, may or may not have remedies available to them in the form of workers's compensation or other similar relief, they do not have a remedy under statutes designed to prohibit discrimination against the disabled. "The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 934 (7th Cir.1995).

medical retirement due to arm injury that precluded him from performing full range of police duties; court held that the ability to effectuate forcible arrests was an essential part of the posi-

tion of police officer, and department was not required to reassign plaintiff to permanent light-duty position that it not have available).